# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

ROBERT PACHECO, derivatively on behalf of TUPPERWARE BRANDS CORPORATION,

Plaintiff,

v.

PATRICIA A. STITZEL, CHRISTOPHER D. O'LEARY, CASSANDRA HARRIS, MICHAEL POTESHMAN, CATHERINE A. BERTINI, SUSAN M. CAMERON, ANTONIO MONTEIRO DE CASTRO, KRISS CLONINGER III, MEG CROFTON, E.V. "RICK" GOINGS, ANGEL R. MARTINEZ, DAVID R. PARKER, RICHARD T. RILEY, JOYCE M. ROCHÉ, and M. ANNE SZOSTAK,

Defendants,

and

TUPPERWARE BRANDS CORPORATION,

Nominal Defendant.

Case No. _____

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND CONTRIBUTION FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

{00375242;1 }

Plaintiff Robert Pacheco ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Contribution for Violations of Federal Securities Laws. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things: (a) review and analysis of regulatory filings made by Tupperware Brands Corporation ("Tupperware" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Tupperware; and (c) review of other publicly-available information concerning Tupperware.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Tupperware against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, unjust enrichment and contribution for violations of federal securities laws. These alleged wrongs resulted in tens of millions of dollars in damages to Tupperware's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Tupperware to tens of millions in potential liability for violations of state and federal law.

2. Tupperware is a direct-to-consumer marketer of products sold around the world. Its brands include Tupperware, Avroy Shlain, Fuller, NaturCare, Nutrimetics, and Nuvo.

3. On February 24, 2020, Tupperware announced that it would be unable to timely file its annual report on Form 10-K and stated that "[t]he Company is conducting an investigation primarily into the accounting for accounts payable and accrued liabilities at its Fuller Mexico beauty business to determine the extent to which these matters may further impact results and to assess and enhance the effectiveness of internal controls at this business." Tupperware also

announced that the total pre-tax impact for 2019 stemming from this matter would be approximately $50-$52 million.

4.      Making matters worse, Tupperware also revealed that "the Company is forecasting a need for relief concerning its existing leverage ratio covenant in its $650 million Credit Agreement . . . to avoid a potential acceleration of the debt, which could have a material adverse impact on the Company."  Following this onslaught of bad news, Tupperware's stock price fell more than 45%, to close at $3.11 per share on February 25, 2020.

5.      Even before the latest revelations wiped out nearly half of Tupperware's market value, the Company had been plagued by the Defendants' mismanagement.  At its peak just over six years ago, Tupperware stock was trading at more than $90 a share.  Under Defendants' leadership, a formerly iconic American brand has been severely mismanaged and damaged.

6.      Moreover, during the relevant period preceding these revelations, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about Tupperware's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) Tupperware lacked effective internal controls; (ii) accounting irregularities existed with respect to the Company's Fuller Mexico business; (iii) the foregoing issues would foreseeably necessitate an investigation that would cause Tupperware to be unable to timely file its 2019 annual report; (iv) Tupperware would need relief from its $650 million Credit Agreement; (v) Tupperware provided overvalued earnings per share ("EPS") guidance; and (vi) as a result of the above, Defendants' public statements were materially false and/or misleading at all relevant times.

7.      Further, as a direct result of this unlawful course of conduct, Tupperware is now the subject of a consolidated federal securities class action lawsuit filed in this district on behalf of

investors who purchased Tupperware's shares. The complaint alleges the Company and certain of its current and former directors and officers violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") based upon many of the same or similar facts and allegations detailed herein.

8.      Plaintiff brings this action against the Individual Defendants (as defined below) to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

9.      Jurisdiction is conferred by 28 U.S.C. §1331. The claims asserted herein arise under Section 21D of the Exchange Act. This Court has exclusive subject matter jurisdiction over the federal securities laws claims under Section 27 of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Tupperware maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Tupperware, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff was a stockholder of Tupperware at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Tupperware stockholder.

13.     Nominal defendant Tupperware operates as a direct-to-consumer marketer of various products across a range of brands and categories in Europe, Africa, the Middle East, Asia Pacific, North America, and South America.  The Company engages in the manufacture and sale of an array of products for consumers under the Tupperware brand name.  The Company also manufactures and distributes skin and hair care products, cosmetics, bath and body care, toiletries, fragrances, jewelry, and nutritional products under the Avroy, Shlain, Fuller, NaturCare, Nutrimetics, and Nuvo brands.  Tupperware is incorporated in Delaware with its principal executive offices located at 14901 South Orange Blossom Trail, Orlando, Florida.  The Company's securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "TUP."

14.     Defendant Patricia A. Stitzel ("Stitzel") served as the Chief Executive Officer ("CEO") and Lead Director of the Company until November 11, 2019.  Previously, she served as the Company's President and Chief Operating Officer from October 2016 through May 2018.  Tupperware paid defendant Stitzel the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $769,682 | $1,362,634 | $138,077 | $28,988 | $390,301 | $2,689,682 |
| 2018 | $48,080 | $1,620,183 | $1,125,011 | | $144,971 | $3,638,245 |

15.     Defendant Christopher D. O'Leary ("O'Leary") served as the Company's interim CEO from November 12, 2019 until April 6, 2020, and as a director since January 2019. He also serves as a member of the Company's Executive Committee.  Tupperware paid defendant O'Leary the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $100,000 | $22,900 | $130,015 | | $3,500 | $256,415 |

16.     Defendant Cassandra Harris ("Harris") has served as the CFO and Executive Vice President of the Company since April 1, 2019.  Tupperware paid defendant Harris the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $381,309 | $100,000 | $600,008 | | $161,226 | $1,242,543 |

17.     Defendant Michael Poteshman ("Poteshman") served as the Company's CFO and Executive Vice President from November 2003 until he retired on March 31, 2019. Additionally, he provided consulting services to the Company from March 31, 2019 through September 30, 2019.  Tupperware paid defendant Poteshman the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Value and Nonqualified | All Other Compensation | Total |
|---|---|---|---|---|---|---|

|  |  |  |  | Compensation Earnings |  |  |
|---|---|---|---|---|---|---|
| 2019 | $147,483 |  | $412,539 | $43,340 | $245,823 | $849,185 |
| 2018 | $544,552 |  | $660,050 | $206,254 | $102,411 | $1,513,268 |

18.     Defendant Catherine A. Bertini ("Bertini") has served as a Company director since 2005. She also serves as a member of the Company's Audit, Finance and Corporate Responsibility Committee.  Tupperware paid defendant Bertini the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $100,000 |  | $130,015 |  | $2,000 | $232,015 |
| 2018 | $100,000 |  | $130,021 |  | $3,662 | $233,683 |

19.     Defendant Susan M. Cameron ("Cameron") has served as a Company director since 2011, and as the Chairman of the Board since November 12, 2019. She also serves as the Chair of the Company's Nominating and Governance Committee and the Executive Committee, and as a member of the Compensation and Management Development Committee and the Capital Allocation Sub-Committee.  Tupperware paid defendant Cameron the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $82,750 | $75,000 | $130,015 |  |  | $287,765 |
| 2018 | $68,000 | $50,000 | $130,021 |  | $3,662 | $233,683 |

20.     Defendant Antonio Monteiro de Castro ("Monteiro de Castro") served as a Company director from 2010 until he resigned on May 22, 2019.  Tupperware paid defendant Monteiro de Castro the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $125,000 | | | | | $125,000 |
| 2018 | $123,000 | | $130,021 | | $162 | $253,183 |

21.     Defendant Kriss Cloninger III ("Cloninger") has served as a Company director since 2003. He also serves as the Chair of the Company's Compensation and Management Development Committee, and as a member of the Nominating and Governance Committee, the Executive Committee, and the Capital Allocation Sub-Committee.  Tupperware paid defendant Cloninger the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $121,500 | | $130,015 | | | $251,515 |
| 2018 | $129,500 | | $130,021 | | $162 | $259,683 |

22.     Defendant Meg Crofton ("Crofton") has served as a Company director since 2016. She also serves as a member of the Company's Nominating and Governance Committee and the

Compensation and Management Development Committee.  Tupperware paid defendant Crofton the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $100,000 | | $130,015 | | | $230,015 |
| 2018 | $100,000 | | $130,021 | | $162 | $230,183 |

23.     Defendant E.V. "Rick" Goings ("Goings") served as a Company director from 1996 until he retired on February 19, 2020. Previously, he served as the Company's Chairman and CEO from October 1997 through May 2018, and as Executive Chair of the Company from May 2018 through May 22, 2019.  Tupperware paid defendant Goings the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $50,000 | | $65,008 | | | $115,008 |
| 2018 | $686,538 | | | | $2,000,000 | $2,686,538 |

24.     Defendant Angel R. Martinez ("Martinez") has served as a Company director since 1998. He also serves as a member of the Company's Compensation and Management Development Committee.  Tupperware paid defendant Martinez the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $100,000 | | $130,015 | | | $230,015 |
| 2018 | $101,500 | | $130,021 | | $162 | $231,683 |

25.     Defendant David R. Parker ("Parker") served as a Company director from 1997 until he retired on May 22, 2019.  Tupperware paid defendant Parker the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $115,000 | | | | | $115,000 |
| 2018 | $114,500 | | $130,021 | | $162 | $244,683 |

26.     Defendant Richard T. Riley ("Riley") has served as a Company director since 2015. He also serves as the Chair of the Company's Audit, Finance and Corporate Responsibility. Tupperware paid defendant Riley the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $60,000 | $50,000 | $130,015 | | | $240,015 |
| 2018 | $50,000 | $50,000 | $130,021 | | $3,662 | $233,683 |

27.     Defendant Joyce M. Roché ("Roché") has served as a Company director since 1998. She also serves as a member of the Company's Audit, Finance and Corporate Responsibility Committee, and the Nominating and Governance Committee.  Tupperware paid defendant Roché the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $75,000 | $25,000 | $130,015 | $4,769 | $3,500 | $238,284 |
| 2018 | $76,500 | $25,000 | $130,021 | $4,318 | $3,115 | $238,954 |

28.     Defendant M. Anne Szostak ("Szostak") has served as a Company director since 2000. She also serves as a member of the Company's Audit, Finance and Corporate Responsibility Committee.  Tupperware paid defendant Szostak the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Fees Earned or Paid in Stock | Stock Awards | Value and Nonqualified Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $100,000 | | $130,015 | | $3,500 | $233,515 |
| 2018 | $100,000 | | $130,021 | | $3,662 | $233,683 |

29.     Defendants Stitzel, O'Leary, Harris, Poteshman, Bertini, Cameron, Monteiro de Castro, Cloninger, Crofton, Goings, Martinez, Parker, Riley, Roché, and Szostak are collectively referred to as the "Individual Defendants."  By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Tupperware and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use

their utmost ability to control and manage Tupperware in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tupperware and not in furtherance of their personal interest or benefit.

30.   Defendants Stitzel, O'Leary, Harris, and Poteshman are collectively referred to herein as the "Officer Defendants."

### Fiduciary Duties

31.   To discharge their duties, the officers and directors of Tupperware were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Tupperware were required to, among other things:

A.   accurately guide the Company's stockholders and the public when speaking about the Company's results of operations and financial condition;

B.   ensure that Tupperware operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations, including the federal securities laws;

C.   conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

D.   remain informed as to how Tupperware conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to

correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

32.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Tupperware, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

<u>**Breaches of Duty**</u>

33.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Tupperware, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

34.     The Individual Defendants breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to disseminate information that failed to disclose to investors that: (i) Tupperware lacked effective internal controls; (ii) accounting irregularities existed with respect to the Company's Fuller Mexico business; (iii) the foregoing issues would foreseeably necessitate an investigation that would cause Tupperware to be  unable to timely file its 2019 annual report; (iv) Tupperware would need relief from its $650 million Credit Agreement; (v) Tupperware provided overvalued earnings per share ("EPS") guidance; and (vi) as a result of the above, Defendants' public statements were materially false and/or misleading at all relevant times.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Tupperware, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Tupperware has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

36.     In addition to these duties, under its Charter in effect since February 28, 2017, the "Audit Committee Defendants," namely Defendants Bertini, Riley, Roché and Szostak, owed specific duties to Tupperware to "assist the Board of Directors in discharging its responsibilities relating to the oversight of the establishment, maintenance and monitoring of controls over the Corporation's financial policies, financial statements and disclosure responsibilities (including required reporting) in order to assure the integrity of the Company's financial statements Moreover the Audit Committee's Charter provides the Audit Committee is responsible for assisting the Board's oversight of:

    A.  The integrity of Tupperware's financial statements and Tupperware's accounting and financial reporting processes and systems of internal control over financial reporting and safeguarding Company assets;

    B.  Tupperware's compliance with legal and regulatory requirements;

    C.  Tupperware's independent auditors' retention, termination, qualifications, independence, and performance;

    D.  The performance of Tupperware's internal auditors and internal audit function;

    E.  Tupperware's financial matters and financial strategy; and

F.  Tupperware's guidelines and policies with respect to risk assessment and risk management.

37.    In addition, the Audit Committee Charter provides:

BRANDS CORPORATION

Audit, Finance and Corporate Responsibility Committee Charter
(Effective February 28, 2017)

Statement of Purpose

The purposes of the Audit, Finance and Corporate Responsibility Committee (the "Committee") of the Board of Directors of Tupperware Brands Corporation (the "Corporation") shall be (1) to assist the Board of Directors in discharging its responsibilities relating to the oversight of the establishment, maintenance and monitoring of controls over the Corporation's financial policies, financial statements and disclosure responsibilities (including required reporting) in order to assure the integrity of the Company's financial statements; (2) selection, management, evaluation, compensation and replacement of independent auditors to the Corporation; (3) evaluation of the performance of the Corporation's internal audit function and its auditors; (4) oversight of the Corporation's compliance generally with laws and regulations, including compliance programs; and (5) oversight of the Corporation's financial structure.

I. Structure and Operations.

The Committee's structure and operations shall be in accordance with the following:

(1) the membership of the Committee shall be composed of a number of directors (but not less than three) as determined by the Board of Directors from time to time and such members shall be appointed or removed by a vote of a majority of members of the Board of Directors; provided, however, that if a director has been removed for cause as contemplated by Section 3.9 of Article III of the Corporation's Amended and Restated By-Laws, such person shall be deemed to have automatically been removed from the Committee;

{00375242;1 }

(2)  the qualifications for membership on the Committee shall consist of  independence as required by the New York Stock Exchange and the Securities Exchange Act of 1934 from time to time, "financially literacy" (with at least one member of the Committee having "financial expertise") as such terms are interpreted by the Board of Directors to achieve compliance with relevant New York Stock Exchange listing requirements and rules promulgated by the Securities and Exchange Commission,  and general satisfaction of qualifications for membership on the Board of Directors of the Corporation as may be in effect at the time of a director's appointment or election, as the case may be, by the Board of Directors; provided, however, that no member of the Committee shall simultaneously serve on the audit committees of more than two other public companies; provided, however, that the qualification of financial literacy may be met within a reasonable period after having become a member of the Committee;

(3)  a majority of the members of the Committee shall constitute a quorum for the transaction of business at any meeting of the Committee, and in the absence of a quorum the member or members thereof present at any meeting, whether or not constituting a quorum, may unanimously appoint one or more independent members of the Board of Directors to act at the meeting to achieve a quorum;

(4)  the chairperson of the Committee shall be as selected by the independent directors of the Corporation, and in the absence of the chairperson of the Committee at any meeting, a majority of the members thereof present at any meeting may appoint a member of the Committee to serve as interim chairperson for purposes of the meeting, and the chairperson of the Committee shall report to the Board of Directors on the proceedings of the Committee's meetings and its actions by consent;

(5)  in the operations of the Committee, it shall:

(a)  delegate any duty of the Committee to a subcommittee of the Committee formed for the purpose, if desirable;

(b)  meet in person or telephonically  as often as necessary to complete its responsibilities;

(c)  require appropriate liaisons from senior management of the Corporation;

(d)  conduct its business in executive session from time to time as it deems desirable; provided, however, that the Committee shall periodically meet in executive session separately  with management, with the head of internal audit, and with the representatives of the independent auditors;

(e)  establish a standing agenda to assure that during the course of its meetings throughout a fiscal year it discharges its duties hereunder;

(f)  recommend for approval of the Board of Directors such matters as may be required by law or prescribed by approval guidelines established by the Board of Directors from time to time;

(g)  require written materials on matters brought before the Committee, delivered sufficiently in advance of a meeting to afford careful review and consideration;

(h)  upon request, distribute to other members of the Board of Directors minutes of the Committee's meetings prepared in accordance with Section 3.8 of the  By-Laws of the Corporation; and

(i)  conduct an annual evaluation of the performance of the Committee.

II. Assistance with Board Oversight.

The Committee shall assist the Board of Directors with the oversight of the (1) integrity of the Corporation's financial statements, (2) Corporation's compliance with legal and regulatory requirements, (3) Corporation's independent auditor's qualifications and independence, and (4) performance of the Corporation's internal audit function and independent auditors.

III. Committee Report.

The Committee shall prepare a Committee report as required by the Securities and Exchange Commission from time to time for inclusion in the Corporation's annual proxy statement to shareholders.

IV. Matters Concerning Independent Auditors.

The Committee shall:

(1) have direct responsibility for the appointment, compensation, retention and oversight and pre-approval (subject to the de minimis exceptions for non-audit services under Section 10A of the Securities Exchange Act of 1934) of the work of the Corporation's independent auditor for audit reports or other services (including tax services), including the resolution of disagreements between the auditor and management, and the independent auditor shall report directly to the Committee;

(2) at least annually, obtain and review a report by the Corporation's independent auditor describing (a) the internal quality control procedures of the independent auditor; (b) any material issues raised by the most recent internal quality control review, or peer review, of the independent auditor or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the independent auditor, and any steps taken to deal with any such issues; and (c) all relationships between the independent auditor and the Corporation in order to assess the independent auditor's independence;

(3) evaluate the independent auditor's qualifications, performance and independence, including that of the lead partner, taking into account the opinions of the Corporation's management and internal auditors and the advisability of the rotation of the audit firm itself, and shall report thereon to the Board of Directors; and review with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including issues or difficulties raised in the course of the independent auditor's work and management's responses, including restrictions on scope of activities or access to information, significant disagreements with management, and the responsibilities, budget and staffing of the Corporation's internal audit function; and

(4) set the Corporation's hiring policies for employees or former employees of the independent auditor.

V. Risk Assessment and Management.

The Committee shall discuss (a) the Corporation's guidelines and policies regarding the governance by which risk assessment and management is undertaken by the Corporation's management, and (b) the Corporation's major financial and operational risk exposures and the steps management has taken to monitor and control such exposures.

VI. Matters Concerning Management Functions.

The Committee shall:

(1) review the function of the Internal Audit Department, its charter, budget, organization, scope, plans, coordination with the independent auditors, activities and performance, and report thereon to the Board of Directors;
(2) approve the selection and/or discharge of the head of Internal Audit, which person shall be directly accountable to the Committee notwithstanding any accountability to management which the Committee may permit;
(3) review the quality and depth of the financial and legal functions worldwide;
(4) review the status of tax returns and tax audits; and
(5) review officers' expenses.

VII. Complaint Procedures.

The Committee shall establish procedures for (a) the receipt, retention and treatment of complaints concerning accounting, internal accounting control or auditing matters, and (b) confidential, anonymous employee submission of concerns over the matters in the preceding clause (a).

VIII. Engagement and Funding of Advisors.

The Committee shall have the power and authority to undertake investigations into the affairs of the Corporation in the course of conducting the business of the Committee and to retain such outside advisors, professionals, counsel and experts (including independent auditors), and to expend sums for administrative matters, as the Committee shall deem necessary or advisable for the purpose and at the expense of the Corporation at funding levels determined by the Committee.

IX.   Matters Concerning Financial Statements, Policies, Disclosures, Releases and Guidance.

The Committee's charge is that of oversight and the Corporation's management is responsible for preparing the Corporation's financial statements and the independent auditors are responsible for auditing those annual financial statements.  The Committee shall be entitled to reasonably rely upon the representations of management and
the independent auditors that the financial statements are prepared in accordance with generally accepted accounting principles.  Additionally, the Committee recognizes that financial management (including the internal audit staff), as well as the independent auditors, have more time, knowledge and more detailed information on the Corporation than do Committee members; consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Corporation's financial statements or any professional certification as to the independent auditor's work.  With this understanding, the Committee shall:

(1) review and discuss with management and the independent auditor the Corporation's annual and quarterly financial statements, including the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and determine whether or not to recommend to the board of directors that such materials be included in the Corporation's annual report on Form 10-K;

(2) discuss with management and the independent auditor significant financial reporting issues and adjustments made in connection with the Corporation's financials statements, including changes in accounting principles;

(3) review and discuss with management and the independent auditor any major issues as to the adequacy of the Corporation's internal controls, any special steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting;

(4) review and discuss with management and the independent auditor the Corporation's internal controls report and the independent auditor's attestation of the report prior to the filing of the Corporation's Form 10-K;

(5) review and discuss quarterly reports from the independent auditors regarding critical account policies and practices, alternative treatments of financial information under generally accepted accounting principles that have been discussed with management and the ramifications of the uses thereof, and other material written communications between management and the independent auditor;

(6) discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures, if any, on the Corporation's financial statements;

(7) review disclosures made to the Committee concerning internal controls (including significant deficiencies and/or material weaknesses) in connection with the certification process or fraud relating to the Corporation's filings with the Securities and Exchange Commission; and

(8) discuss the Corporation's earnings releases and information and guidance provided to analysts and ratings agencies, though such discussions may be general and need not be in advance of releases or guidance.

X. Matters Concerning Corporate Responsibility.

The Committee shall:

(1) recommend for approval by the Board of Directors a Code of Conduct and Code of Ethics for Financial Executives regarding the Corporation's compliance with laws and regulations and ethical conduct, including any amendments thereto from time to time;

(2) periodically review the Corporation's compliance with legal and regulatory requirements and its programs and procedures designed to assure adherence to and enforcement with law and the codes; and

(3) review and approve, as required, all related-party transactions, including any requests for waiver of the Corporation's codes.

XI. Matters Concerning Financial Structure.

The Committee shall periodically review and recommend to the Board of Directors, as needed:

(1) the overall financial structure and financial condition of the Corporation;

(2) the long-term financial needs and plans of the Corporation;

(3) dividend policy;

(4) the issuance or purchase of the capital stock of the Corporation;

(5) issuance or redemption of long-term debt of the Corporation or any of its subsidiaries, excluding normal sinking fund purchases;

(6) guarantee by the Corporation or any subsidiary of the Corporation of indebtedness of any other subsidiary of the Corporation or that of a third party;

(7) review investment returns related to assets of the Corporation's employee retirement and savings plans; and

(8) insurance coverage for the Corporation and its directors and officers.

38.     In addition, Tupperware maintains a Code of Ethics for Financial Executives (the "Code of Ethics").  The Code of Ethics must be signed by the CEO and CFO, among others.  The Code of Ethics provides, in pertinent part, that covered executives must certify that they will:

1.  Familiarize myself with the Corporation's accounting and financial policies and its Code of Conduct and comply therewith.

2.   Maintain the appropriate level of professional credentials applicable to my duties with the Corporation, including any continuing education requirements, general awareness of professional developments and professional certifications or recertifications.

3.   Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.

4.   Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable.

5.   Comply with rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies.

6.   Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing my independent judgment to be subordinated.

7.   Respect the confidentiality of information acquired in the course of my work except when authorized or otherwise legally obligated to disclose. Confidential information acquired in the course of my work will not be used for personal advantage.

8.   Share knowledge and maintain skills important and relevant to my constituents' needs.

9.   Proactively promote ethical behavior as a responsible partner among peers in my work environment.

10.  Achieve responsible use of and control over all assets and resources employed by or entrusted to me.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Tupperware, regarding the Individual Defendants' management of Tupperware's operations and the Company's business and results of operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Tupperware and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

41.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### SUBSTANTIVE ALLEGATIONS

### Background

45.     Tupperware is a direct-to-consumer marketer of products sold around the world. Its brands include Tupperware, Avroy Shlain, Fuller, NaturCare, Nutrimetics, and Nuvo.

### Improper Statements Issued During the Relevant Period

46.     The Relevant Period begins on January 30, 2019, when Tupperware issued a press release announcing its fourth quarter 2018 financial results providing a full-year 2019 guidance of $3.86 to $4.01 GAAP EPS (compared to $3.11 from full-year 2018).

47.     On February 26, 2019, Tupperware filed a Form 10-K for its fiscal year ended December 29, 2018 with the SEC, which provided the Company's financial results and was signed by Defendants Stitzel and Poteshman ("2018 10-K").   The 2018 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Stitzel and Poteshman attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

48.     Regarding the Company's internal controls, the 2018 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of December 29, 2018.

**Management's Report on Internal Control Over Financial Reporting**

The Company's management is also responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rule 13a-15(f). As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's internal control over financial reporting was effective as of the end of the period covered by this report. The effectiveness of the Company's internal control over financial reporting as of December 29, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered certified public accounting firm, as stated in its report which is included herein.

**Changes in Internal Controls**

There have been no significant changes in the Company's internal control over financial reporting during the Company's fourth quarter that have materially affected or are reasonably likely to materially affect its internal control over

financial reporting, as defined in Rule 13a-15(f) promulgated under the Securities Exchange Act of 1934, as amended.

49.     On April 24, 2019, Tupperware issued a press release announcing its second quarter 2019 financial results and providing a full-year 2019 financial results guidance of $3.65 to $3.76 GAAP EPS (compared to $3.11 from full-year 2018).

50.     On May 2, 2019, Tupperware filed a Form 10-Q for the quarterly period ended March 30, 2019 with the SEC, which was signed by Defendant Harris and provided the Company's financial results.  The May 2, 2019 Form 10-Q contained signed certifications pursuant to SOX by Defendants Stitzel and Harris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

51.     Regarding the Company's internal controls, the May 2, 2019 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective.

{00375242;1 }

**Changes in Internal Controls**

There have been no significant changes in the Company's internal control over financial reporting during the Company's first quarter that have materially affected or are reasonably likely to materially affect its internal control over financial reporting, as defined in Rule 13a-15(f) promulgated under the Securities Exchange Act of 1934, as amended ( the "Exchange Act").

52.     On July 24, 2019, Tupperware issued a press release announcing its second quarter 2019 results and providing full-year 2019 guidance of $2.94 to $3.09 GAAP EPS (compared to $3.11 from full-year 2018).

53.     On August 1, 2019, Tupperware filed a Form 10-Q for the quarterly period ended June 29, 2019 with the SEC which was signed by Defendant Harris and provided the Company's financial results.  The August 1, 2019 Form 10-Q contained signed certifications pursuant to SOX by Defendants Stitzel and Harris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

54.     Regarding the Company's internal controls, the August 1, 2019 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer

and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective.

**Changes in Internal Controls**

There have been no significant changes in the Company's internal control over financial reporting during the Company's second quarter that have materially affected or are reasonably likely to materially affect its internal control over financial reporting, as defined in Rule 13a-15(f) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

55.     On October 30, 2019, Tupperware issued a press release announcing its third quarter 2019 results and providing full-year 2019 financial guidance of $1.93 to $1.99 GAAP EPS (compared to $3.11 from full-year 2018).

56.     On November 6, 2019, Tupperware filed a Form 10-Q for the quarterly period ended September 28, 2019 with the SEC, which was signed by Defendant Harris and provided the Company's financial results.  The November 6, 2019 Form 10-Q contained signed certifications pursuant to SOX by Defendants Stitzela and Harris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

57.     Regarding the Company's internal controls, the November 6, 2019 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Further, because of the inherent limitations in all control

systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the company will be detected.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective.

**Changes in Internal Controls**

There have been no significant changes in the Company's internal control over financial reporting during the Company's third quarter that have materially affected or are reasonably likely to materially affect its internal control over financial reporting, as defined in Rule 13a-15(f) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

58.     Regarding the Company's credit agreement, the November 6, 2019 Form 10-Q

stated:

**Credit Agreement**

On March 29, 2019, the Company and its wholly owned subsidiaries Tupperware Nederland B.V., Administradora Dart, S. de R.L. de C.V., and Tupperware Brands Asia Pacific Pte. Ltd. (the "Subsidiary Borrowers"), amended and restated its multicurrency Credit Agreement, amended by Amendment No. 1 dated August 28, 2019 (so as amended, the "Credit Agreement"), with JPMorgan Chase Bank, N.A. as administrative agent (the "Administrative Agent"), swingline lender, joint lead arranger and joint bookrunner, and Credit Agricole Corporate and Investment Bank, HSBC Securities (USA) Inc., Mizuho Bank, Ltd. and Wells Fargo Securities, LLC, as syndication agents, joint lead arrangers and joint bookrunners. The Credit Agreement replaces the credit agreement dated September 11, 2013 and as amended (the "Old Credit Agreement") and, other than an increased aggregate amount that may be borrowed, an improvement in the consolidated leverage ratio covenant and a slightly more favorable commitment fee rate, has terms and conditions similar to that of the Old Credit Agreement. The Credit Agreement makes available to the Company and the Subsidiary Borrowers a committed five-year credit facility in an aggregate amount of $650 million (the "Facility Amount").

*        *        *

The financial covenants provide for a maximum Consolidated Leverage Ratio of 3.75 to 1.0 and a minimum interest coverage ratio of 3.0 to 1.0 (defined as consolidated EBITDA divided by consolidated total interest expense). For purposes of the Credit Agreement, consolidated EBITDA represents earnings before interest, income taxes, depreciation and amortization, as adjusted to exclude unusual, non-recurring gains as well as non-cash charges and certain other items. As of September 28, 2019, and currently, the Company was in compliance with the financial covenants in the Credit Agreement.

Under the Credit Agreement and consistent with the Old Credit Agreement, the Guarantor unconditionally guarantees all obligations and liabilities of the Company and the Subsidiary Borrowers relating to the Credit Agreement, supported by a security interest in certain "Tupperware" trademarks and service marks. The Credit Agreement includes a trigger whereby the Company would be required to provide additional collateral and subsidiary guarantees if Moody's Investors Services, Inc. downgrades its existing ratings two notes or more or S&P Global Ratings downgrades its existing ratings one or more notches.

*        *        *

At September 28, 2019, the Company had $406.1 million of unused lines of credit, including $324.9 million under the committed, secured Credit Agreement, and $81.2 million available under various uncommitted lines around the world.

59.    The above statements identified above were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) Tupperware lacked effective internal controls; (ii) accounting irregularities existed with respect to the Company's Fuller Mexico business; (iii) the foregoing issues would foreseeably necessitate an investigation that would cause Tupperware to be unable to timely file its 2019 annual report; (iv) Tupperware would need relief from its $650 million Credit Agreement; (v) Tupperware provided overvalued EPS guidance; and (vi) as a result of the above, Defendants' public statements were materially false and/or misleading at all relevant times.

60.    The truth began to emerge on February 24, 2020, when the Company issued a press release announcing that the Company "will file a Form 12b-25 Notification of Late Filing with the

Securities and Exchange Commission to provide a 15-calendar day extension within which to file

its Form 10-K for the fiscal year ended December 28, 2019" and stating that:

> GAAP diluted E.P.S. is expected to be in the range of breakeven to $0.34 versus $3.11 in the prior year. The current year was negatively impacted by $40 million for the non-cash impairment of goodwill and intangible assets and $35 million of re-engineering costs

> The Fuller Mexico full-year 2019 negative impact on an adjusted* pre-tax basis is expected to be in the range of $19-21 million

> Impact of taxes on adjusted* E.P.S. is expected to be in the range of $1.66-$1.98 in 2019

> Adjusted* pre-tax return on sales is expected to be approximately 10% or 12% excluding the Fuller Mexico impact, versus 14% in the prior year

> Adjusted* diluted E.P.S. is expected to be $1.35-$1.70 versus $4.30 in the prior year, including $0.26 cents from foreign currency

> *       *       *

The Company experienced continued execution challenges and unfavorable macro-economic trends most notably in its core markets of Brazil, China, and U.S. & Canada. The impact on segment profit is expected to be approximately $83 million or $0.75 cents per share, excluding Fuller Mexico of $19-21 million.

The Company is conducting an investigation primarily into the accounting for accounts payable and accrued liabilities at its Fuller Mexico beauty business to determine the extent to which these matters may further impact results and to assess and enhance the effectiveness of internal controls at this business. This matter is $9-11 million of the total expected $19-21 million full-year impact on an adjusted* pre-tax basis. In addition, total impairments for Fuller Mexico are expected to be approximately $31 million. The total pre-tax impact for 2019 is approximately $50-$52 million.

"While challenges in Brazil, China, and the U.S. & Canada businesses persisted in the fourth quarter in line with our expectations, our preliminary results were further affected by financial reporting issues in Fuller Mexico. We are working rapidly to address these Fuller Mexico issues in order to finalize our 2019 results. We are also focused on facing the clear headwinds in our core markets and accelerating the pace at which we can achieve meaningful improvement in the business," said Chris O'Leary, the Company's Interim CEO.

*       *       *

**Debt Covenant**

Based on the 2020 outlook, the Company is forecasting a need for relief concerning its existing leverage ratio covenant in its $650 million Credit Agreement dated March 29, 2019 (the "Credit Agreement"), to avoid a potential acceleration of the debt, which could have a material adverse impact on the Company. Approvals have been received, pending completion of final documentation, from participating banks to amend the maximum consolidated leverage (debt-to-EBITDA) in the Credit Agreement for the required relief. In connection with the amendment, the Company and certain of its subsidiaries will provide additional collateral and subsidiary guarantees.

61.     On this news, the Company's stock price fell $2.61 per share, or over 45.63%, to

close at $3.11 per share on February 25, 2020.

62.     On March 2, 2020, the Company filed a Form 8-K announcing the renegotiation

and amendment of its Credit Agreement. The Form 8-K stated, in part:

On February 28, 2020 , Tupperware Brands Corporation (the " Company ") and its wholly owned subsidiaries Tupperware Nederland B.V., Administradora Dart, S. de R.L. de C.V. and Tupperware Brands Asia Pacific Pte. Ltd. entered into Amendment No. 2 (" Amendment No. 2 ") to the Second Amended and Restated Credit Agreement, dated as of March 29, 2019, as amended by Amendment No. 1, dated as of August 28, 2019 (as so amended, the " Credit Agreement "), with JPMorgan Chase Bank, N.A. as administrative agent, and the lenders party thereto.

Among other changes to the Credit Agreement, Amendment No. 2 modifies the financial covenant in the Credit Agreement that requires the Company to maintain at the end of each measurement period a specified ratio of (i) Consolidated Funded Indebtedness to (ii) Consolidated EBITDA (the " Consolidated Leverage Ratio "). Prior to Amendment No. 2, the Consolidated Leverage Ratio was not greater than or equal to 3.75 to 1.00. Following Amendment No. 2, the Company is required to maintain at the last day of each measurement period a Consolidated Leverage Ratio not greater than or equal to the ratio as set forth below opposite the period that includes such day (or, if such day does not end on the last day of the calendar quarter, that includes the last day of the calendar quarter that is nearest to such day).

| Period | Consolidated Leverage Ratio |
| --- | --- |
| From the Amendment No. 2 effective date to and including June 27, 2020 | 5.75 to 1.00 |
| September 26, 2020 | 5.25 to 1.00 |
| December 26, 2020 | 4.50 to 1.00 |
| March 27, 2021 | 4.00 to 1.00 |
| June 26, 2021 and thereafter | 3.75 to 1.00 |

Amendment No. 2 eliminates the requirement that a Non-Investment Grade Ratings Event must occur before the Company is required to cause the Additional Guarantee and Collateral Requirement to be satisfied. Pursuant to Amendment No. 2, the Company will now be required to cause certain of its domestic subsidiaries to become guarantors and to pledge, and to cause certain of its domestic subsidiaries to pledge, additional collateral.

63.     On March 12, 2020, Tupperware filed a Form 10-K for its fiscal year ended December 28, 2019 with the SEC.  Tupperware's full year sales were down 13% versus the previous year and 9% in local currency.  GAAP diluted earnings per share were $0.25 versus $3.11 in the prior year.  Operating cash flow net of investing was $60 million.  With regard to the wrongdoing, the Form 10-K added that:

Operational risk generally refers to the risk of loss resulting from the Company's operations, including those operations performed for the Company by third parties. This would include but is not limited to the risk of fraud by employees or persons outside the Company, the execution of unauthorized transactions by employees or others, errors relating to transaction processing, breaches of the internal control system and compliance requirements, and unplanned interruptions in service. Certain of these types of activities were identified in the course of the Company's review of the Fuller Mexico business.

The risk of operational loss also includes the potential legal or regulatory actions that could arise as a result of an operational deficiency, or as a result of noncompliance with applicable regulatory standards. The Company must comply with a number of legal and regulatory requirements, including those under the Sarbanes-Oxley Act of 2002, as amended.

The Company maintains systems of internal controls that provide management with timely and accurate information about the Company's operations. These systems have been designed to manage operational risk at appropriate levels given the Company's financial strength, the environment in which it operates, and considering factors such as competition and regulation. The Company has also established procedures that are designed to ensure that policies relating to conduct, ethics, and business practices are followed on a uniform basis. While there can be no assurance that the Company will not suffer losses in the future due to operational errors that the Company discovers, management continually monitors and works to improve its internal controls, systems, and corporate-wide processes and procedures.

In February 2020, the Company, with the help of external legal and accounting resources, conducted an investigation into its Fuller Mexico business primarily regarding the accounting for accounts payable and accrued liabilities. The financial impact of this matter is discussed more fully in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Segment Results - North America.". While the Company believes that it has resolved this matter, there can be no assurances that similar issues will not be identified in the future.

64.     With regard to the financial impact of the misconduct, the Form 10-K added that:

In the fourth quarter of 2019, as part of the on-going assessment of goodwill and intangible assets, the Company noted that the financial performance of the units selling Fuller products had fallen below their previous trend lines and it concluded that they would fall significantly short of previous expectations. Revenue further declined in the fourth quarter of 2019 and margins significantly declined from third to fourth quarter resulting in an approximate 30 percent decrease in margins in the forecasted period. This significant impact to margins also impacted the royalty rate which was reduced from the rate utilized in the third quarter of 2019. These declines in the financial performance were deemed to be a triggering event and a test for recoverability and impairment was performed over the definite-lived intangible asset which included comparing the sum of the estimated undiscounted future cash flows, based on the relief from royalty method, attributable to the Fuller tradename to its carrying value. The result of the impairment test was to record a $20.3 million impairment to the Fuller tradename in the fourth quarter of 2019 recorded in "Impairment of goodwill and intangible assets" of the Consolidated Statements of Income. As the units that sell Fuller products are in different geographical areas, impairments of $6.0 million , $13.6 million and $0.7 million were recorded for the Asia Pacific, North America and South America segments, respectively, leaving a $6.5 million carrying value as of December 28, 2019.

***

The Company also booked a valuation allowance of $18.4 million in the fourth quarter of 2019 against the net tax assets for Fuller Mexico. The Company noted that the financial performance of Fuller had fallen below their previous trend lines and it concluded that they would fall significantly short of forecasted expectations. Revenue and profitability further declined in the fourth quarter of 2019. These declines in the financial performance triggered a reassessment of the realizability of the deferred tax assets in the fourth quarter resulting in a full valuation of $18.4 million being taken against the Fuller net deferred tax assets.

65.     On this news, over the course of the next two trading days, Tupperware shares fell from $2.27 per share to close at $1.25 per share on Monday, March 16, 2020, a drop of 45%. This further drop erased another $49.9 million in market capitalization.

## UNDISCLOSED ADVERSE FACTS

66.     During the Relevant Period, Defendants materially misled the investing public by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Tupperware's business, operations, and prospects as alleged herein.  As described herein, during the Relevant Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Tupperware's financial well-being and prospects.

## DAMAGES TO TUPPERWARE

67.     As a result of the Individual Defendants' improprieties, Tupperware and the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about Tupperware's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) Tupperware lacked effective internal controls; (ii) accounting irregularities existed with respect to the Company's Fuller Mexico business; (iii) the foregoing issues would foreseeably necessitate an investigation that would cause Tupperware to be unable to timely file its 2019 annual report; (iv) Tupperware would need relief from its $650 million Credit Agreement; (v) Tupperware provided overvalued earnings per share ("EPS") guidance; and (vi) as a result of the above, Defendants' public statements were materially false and/or misleading at all relevant times.

68.    Tupperware's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, the Company's current and potential investors consider a company's trustworthiness, stability, and ability to evaluate known risks. Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and regulations, and are uncertain about their own financial condition. Accordingly, the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, Tupperware stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

69.    Further, as a direct and proximate result of the Individual Defendants' actions, Tupperware has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

    A.  costs incurred from investigations, including any fines;

    B.  costs incurred from the Company's internal investigation into its accounting practices and policies;

    C.  costs incurred from revisiting and restating previous financial reports;

    D.  costs incurred from restoring the value of its impaired brands and trademarks;

    E.  costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

    F.  costs incurred from compensation and benefits paid to the Defendants who have breached their duties to Tupperware.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

70.     Plaintiff brings this action derivatively in the right and for the benefit of Tupperware to redress injuries suffered, and to be suffered, by Tupperware as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and contribution for violations of federal securities laws, as well as the aiding and abetting thereof, by the Individual Defendants. Tupperware is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

71.     Plaintiff will adequately and fairly represent the interests of Tupperware in enforcing and prosecuting its rights.

72.     Plaintiff was a stockholder of Tupperware at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Tupperware stockholder.

73.     The current Board of Tupperware consists of the following thirteen individuals: Defendants O'Leary, Bertini, Cameron, Cloninger, Crofton, Martinez, Riley, Roché and Szostak, as well as nonparties Aedhmar Hynes, Miguel Fernandez, Richard Goudis and Mauro Schnaidman. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### Demand Is Excused Because Defendants Face a
### Substantial Likelihood of Liability for Their Misconduct

74.     As alleged above, Defendants O'Leary, Bertini, Cameron, Cloninger, Crofton, Martinez, Riley, Roché and Szostak breached their fiduciary duties of loyalty by making or causing Tupperware to make improper statements in the Company's press releases and SEC filings. Specifically, Defendants failed to disclose to investors that: (i) Tupperware lacked effective internal controls; (ii) accounting irregularities existed with respect to the Company's Fuller

Mexico business; (iii) the foregoing issues would foreseeably necessitate an investigation that would cause Tupperware to be unable to timely file its 2019 annual report; (iv) Tupperware would need relief from its $650 million Credit Agreement; (v) Tupperware provided overvalued earnings per share ("EPS") guidance; and (vi) as a result of the above, Defendants' public statements were materially false and/or misleading at all relevant times.  As members of the Board, Defendants O'Leary, Bertini, Cameron, Cloninger, Crofton, Martinez, Riley, Roché and Szostak participated in, approved, or permitted the wrongs alleged herein and participated in efforts to disguise these wrongs from the Company's stockholders. Because of their access to, and review of, internal corporate documents, internal conversations, and attendance at meetings, each of the Defendants knew or recklessly disregarded material, nonpublic information concerning the Company's improper statements. Thus, the majority of Tupperware's Board is unable to exercise independent judgment in deciding whether to bring this action because each member of the Board personally participated in the wrongdoing or is dependent upon the other defendants who did.

75.     Defendants Bertini, Riley, Roché and Szostak, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused the dissemination and publication of these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus,

Defendants Bertini, Riley, Roché and Szostak face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

76.     Any suit by the current directors of Tupperware to remedy these wrongs would expose Defendants O'Leary, Bertini, Cameron, Cloninger, Crofton, Martinez, Riley, Roché and Szostak and Tupperware to liability for violations of the federal securities laws in the pending consolidated securities class action, and would result in civil actions being filed against one or more of the other Individual Defendants. The securities class action alleges violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against the Individual Defendants in this action, then Tupperware's efforts would compromise its defense of the securities class action. Accordingly, demand on the Board is excused.

**Demand Is Excused for Additional Reasons**

77.     Additionally, the Board admits in the Company's 2019 Proxy Statement Defendant O'Leary was not independent while he served as Interim Chief Executive Officer of the Company. O'Leary is also a named defendant in a consolidated securities class action.  Therefore, Defendant is not capable of exercising independent judgment in considering a demand to commence and vigorously prosecute this action.

78.     Further, Defendants O'Leary, Bertini, Cameron, Cloninger, Crofton, Martinez, Riley, Roché, and Szostak each made false and misleading statements, either by signing the Company's misleading filings with the SEC on in earnings conference calls. Therefore, Defendants O'Leary, Bertini, Cameron, Cloninger, Crofton, Martinez, Riley, Roché, and Szostak face a substantial likelihood of liability.

79.     Additionally, demand is futile as to Defendants Cameron, Goings, and Monteiro de Castro due to their long-standing, overlapping business and personal relationships.  Defendant Cameron was a longtime employee at Brown & Williamson Holdings Inc. (formerly known as Brown & Williamson Tobacco Corporation ("Brown & Williamson")).  Cameron was named president and CEO of Brown & Williamson in January 2001.  In July 2004, Brown & Williamson combined with R. J. Reynolds, and Reynolds American, Inc. ("Reynolds American") was created as a new holding company, with R. J. Reynolds Tobacco Company as its chief operating subsidiary. Cameron became president and CEO of Reynolds American in 2004. She became chairman in January 2006.  After briefly retiring in 2009, Defendant Cameron in December 2010 retired as the chairwoman of Reynolds American.  In January 2014 Cameron re-joined the board at Reynolds American, after spending several years in retirement. On May 1, 2017 she returned to the role of CEO, a role she held until January 2017.  Defendant Cameron served as executive chairman of the Reynolds board of directors until May 2017, when she became non-executive chairman.  Defendant Goings joined Reynolds American as a director in July 2004 (after serving on its predecessor, R.J. Reynolds Tobacco Holdings, Inc. between June 2002 and July 2004), and he served until February 2007.  Monteiro de Castro also joined the board of Reynolds American in July 2004 and served until December 2008.  Thus, defendants Cameron, Goings, and Monteiro de Castro played a role in their respective, lucrative appointments to various key roles at Tupperware and other entities.  Accordingly, due to their longtime personal and mutually beneficial business relationships, Defendants Cameron, Goings, and Monteiro de Castro would be incapable of considering a demand to bring litigation against one another.

80.     Moreover, Defendants Cameron and Goings also served together as directors of R. R. Donnelley & Sons Company ("R. R. Donnelley").  Goings served as an R. R. Donnelley director

from 2008 through February 2010, while Cameron served as an R. R. Donnelley director from January 2009 and served through October 2016. Accordingly, Defendant Goings is presumed to have play a key role in Cameron's appointment to the R. R. Donnelley board in 2009 and the Tupperware Board in 2011. These directorships have been lucrative for Cameron who was paid more than $2.2 million by R. R. Donnelley between 2009 and 2016, and more than $1.9 million by Tupperware since 2011. Accordingly, due to their longtime personal and mutually beneficial business relationships, Defendants Cameron and Goings would be incapable of considering a demand to bring litigation against one another.

81.     Additionally, demand is futile as to Defendants Szostak and Parker due to their long-standing, overlapping business and personal relationships. Defendant Szostak and Parker served together as directors of SFN Group, as well as its predecessor company. Prior to Defendant Parker joining SFN Group in 2003, Defendants Szostak and Parker had already been serving together on the Tupperware Board for 3 years. Thereafter, Defendant Parker enabled Defendant Szostak's appointment to the SFN Group board in March 2005, where she served on the board's corporate governance and nominating committees with Parker. Both Defendant Szostak and Parker served through 2011 when the company was acquired by Randstad Holding NV. The appointment was lucrative for Szostak who was paid more than $785,000 for serving on SFN Group's Board. Accordingly, due to their longtime personal and mutually beneficial business relationships, Defendants Szostak and Parker would be incapable of considering a demand to bring litigation against one another.

82.     Additionally, demand is futile as to Defendants Szostak and Roché due to their long-standing, overlapping business and personal relationships. Defendants Szostak and Roché served together as directors of Dr. Pepper Snapple Group, Inc. ("Dr. Pepper"). When Defendant

Szostak joined the board of Dr. Pepper in May 2008, she had already been serving on the Tupperware Board with Defendant Roche for 8 years. Thereafter, she caused Defendant Roché to be appointed to the Dr. Pepper Board in February 2011, where she served on the board's compensation committee with Defendant Szostak. They served together until May 2017 when Defendant Roché did not stand for re-election because she had reached the board's mandatory retirement age.  Accordingly, due to their longtime personal and mutually beneficial business relationships, Defendants Szostak and Roché would be incapable of considering a demand to bring litigation against one another.

83.     Additionally, demand is futile as to Defendants Szostak and Riley due to their long-standing, overlapping business and personal relationships.  Szostak and Riley worked together at New England Business Service, Inc. ("NEBS").  Defendant Riley joined NEBS in 1997, and in August 2002, he became President and COO, after which he was elected as a director in October 2002.  He was appointed CEO on January 1, 2004.  Defendant Szostak was appointed as a director in 1998.  Defendants Szostak and Riley both left the company in June 2004 when the company was acquired by Deluxe Corporation. Thereafter, Defendant Szostak enabled Riley's appointment to the Tupperware Board in 2015. The appointment has been particularly lucrative for Defendant Riley who has so far been paid more than $1.1 million for serving on Tupperware's Board Accordingly, due to their longtime personal and mutually beneficial business relationships, Defendants Szostak and Roché would be incapable of considering a demand to bring litigation against one another.

84.     Additionally, demand is futile as to Defendants Szostak and Goings due to their long-standing, overlapping business and personal relationships. Defendants Szostak and Goings served together for many years on the Boys & Girls Clubs of America's ("BGCA") Board of

Governors. Goings joined the BGCA Board of Governors in 1989. Defendant Szostak joined the BGCA Board of Governors in 1997, a few years before her appointment to the Tupperware Board. Defendant Szostak became the Chairperson of BGCA in 2005 and served through 2006. Defendant Goings was Szostak's immediate successor as Chairperson in 2007.  Defendant Goings had previously served as Chairperson in 1996. Defendants Szostak and Goings currently both have the title of BGCA "Chairperson Emeritus."  Defendants Szostak and Goings would be incapable of considering a demand to bring litigation against one another.

**FIRST CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duty**

85.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     The Individual Defendants owed and owe Tupperware fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Tupperware the highest obligation of good faith, fair dealing, loyalty, and due care. These duties included an obligation of which the Individual Defendants were fully aware, to manage Tupperware's business and affairs in accordance with all laws applicable to the Company's operations, including the federal securities laws, rules, and regulations.

87.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Tupperware, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

88.     The Individual Defendants breached their duty of loyalty by purposefully knowingly, or recklessly failing to implement and maintain an adequate system of internal

controls. Specifically, the Individual Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly causing or allowing the Company to violate federal securities laws, and allowing the Company to suffer needless losses by failing to implement and maintain an adequate system of internal controls to ensure the Company's public statements were truthful and disclosed any fraud or any material weakness in internal controls over financial reporting.

89. In addition, the Individual Defendants breached their fiduciary duties of loyalty by making or allowing the Company to make improper statements in the Company's publicly disseminated documents and SEC filings concerning Tupperware's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.

90. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company's internal controls were inadequate, specifically as they relate to the procurement area; and (ii) that Tupperware would be forced to write off a significant amount of goodwill and certain intangible assets.  Further, the Officer Defendants violated the terms of the Company's Code of Ethics. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

91. The Individual Defendants, as directors of the Company, owed Tupperware the highest duty of loyalty. These Defendants breached their duty of loyalty by recklessly permitting the improper activity and improper statements detailed herein. The Individual Defendants knew or were reckless in not knowing that: (i) the Company's internal controls were inadequate, specifically as they relate to the procurement area; and (ii) that Tupperware would be forced to write off a

significant amount of goodwill and certain intangible assets. Accordingly, these Defendants breached their duty of loyalty to the Company.

92.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein that were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

93.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tupperware has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## SECOND CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

94.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

95.     As a result of the Individual Defendants' failure to maintain adequate internal controls to over financial reporting, these fiduciaries have caused Tupperware to waste its corporate assets by forcing the Company to expend valuable resources to investigating its financial statements.

96.     In addition, as a result of the Defendants' misrepresentation and concealment of material facts, the Company is now subject to a consolidated securities class action. The Individual Defendants have caused the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

{00375242;1 }

97.     The Individual Defendants have caused Tupperware to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

98.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

99.     Plaintiff, on behalf of Tupperware, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

100.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

101.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense  and to the detriment of Tupperware. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Tupperware.

102.    Plaintiff, as a stockholder and representative of Tupperware, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

103.    Plaintiff, on behalf of Tupperware, has no adequate remedy at law

### FORTH CLAIM
### Against Defendants Stitzel, Harris, Poteshman, and O'Leary for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act

104.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

{00375242;1 }

105.    Defendants Stitzel, Harris, Poteshman, and O'Leary are named as defendants in a consolidated securities class action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

106.    Tupperware is named as a defendant in consolidated securities class actions that allege and assert claims arising under Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If Tupperware is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

107.    As officers, directors, and otherwise, defendants Stitzel, Harris, Poteshman, and O'Leary had the power or ability to, and did, control or influence, either directly or indirectly, Tupperware's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

108.    Defendants Stitzel, Harris, Poteshman, and O'Leary are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

109.    Defendants Stitzel, Harris, Poteshman, and O'Leary have damaged the Company and are liable to the Company for contribution.

110.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**FIFTH CLAIM**
**Against the Individual Defendants for Violation of Section 10(b) of The Exchange Act**

111.    Plaintiff repeat and re-alleges each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

112.    During the Relevant Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the relevant period, did: (i) deceive the investing public as alleged herein; and (ii) cause investors to purchase Tupperware's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

113.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Tupperware's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

114.    The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Tupperware's financial well-being and prospects, as specified herein.

115.    The Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and

{00375242;1 }

a course of conduct as alleged herein in an effort to assure investors of Tupperware's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Tupperware and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Relevant Period.

116.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Relevant Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

117.    The Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Tupperware's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Relevant Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

118.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Tupperware's securities was artificially inflated during the Relevant Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Relevant Period investors acquired Tupperware's securities during the Relevant Period at artificially high prices and were damaged thereby.

119.    At the time of said misrepresentations and/or omissions, investors were ignorant of their falsity and believed them to be true.  Had investors known the truth regarding the problems that Tupperware was experiencing, which were not disclosed by Defendants, investors would not have purchased or otherwise acquired their Tupperware securities, or, if they had acquired such securities during the Relevant Period, they would not have done so at the artificially inflated prices which they paid.

120.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

121.    As a direct and proximate result of Defendants' wrongful conduct, class members suffered damages in connection with their respective purchases and sales of the Company's securities during the Relevant Period.

## SIXTH CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

122.    Plaintiff repeats and re-alleges each and every allegation contained paragraphs 1 through 84 and 111 through 121 as if fully set forth herein.

123.    The Individual Defendants acted as controlling persons of Tupperware within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which investors contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by investors to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

124.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence

the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

125.     As set forth above, Tupperware and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, investors suffered damages in connection with their purchases of the Company's securities during the Relevant Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Tupperware, demands judgment as follows:

A.     Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and contribution for violations of federal securities law;

B.     Directing Tupperware to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tupperware and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies;

1.  a proposal to strengthen the Company's controls over financial reporting;

2.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

{00375242;1 }

DERIVATIVE COMPLAINT
51

3.   a provision to permit the stockholders of Tupperware to nominate at least three candidates for election to the Board; and

4.   proposal to strengthen Tupperware's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, an state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Tupperware has an effective remedy;

D.      Awarding to Tupperware restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  May 26, 2020

**KOMLOSSY LAW P.A.**

*/s/ Emily C Komlossy*
Emily Komlossy (FBN 7714)
ekomlossy@komlossylaw.com
4700 Sheridan St., Suite J
Hollywood, FL 33021
Phone: (954) 842-2021
Fax: (954) 416-6223


**OF COUNSEL:**
**POMERANTZ LLP**
Gustavo F. Bruckner
Samuel J. Adams
gfbruckner@pomlaw.com
sjadams@pomlaw.com
600 Third Avenue, 20th Floor
New York, NY 10016
Phone: (212) 661-1100

Fax: (917) 463-1044

***Counsel for Plaintiff***